December 17.
JUDGE CARR
delivered his opinion.
On the 29th day of July, 1807, Thomas Wooldridge sold to Thompson Blunt, by a contract under the seáis of the parties, a tract of land lying in the county of Chesterfield, and containing one hundred and twenty-eight acres, for the sum of $2,000, payable, one half on the 25th December, 1807, the other half on the 25th of December, 1808; and it was further agreed, that Blunt was to commence in the month of July, 1808, to search upon the land for coal, by sinking shafts or boring with bare rods, for the purpose of speedily' finding the same, and to continue such search from time to time, as his convenience and the state of the weather will permit, until the 1st of July, 1809, and to be guided in his sinking and boring by the said Wooldridge, or his agent, at his said Blunt’s sole expense, and if within the time aforesaid, that is to say, before the 1st of July, 1809, the said Blunt should find a good and sufficient body of coal to work on said land, in that case said Blunt binds himself to pay to said Wooldridge, *or his assigns, $4,000 for said land ; that is to say, $2,000 in addition to the bonds already given. In November, 1807, Blunt having sold out his bargain to Henry Heth, gave written directions to Wooldridge; to convey the land to him, which was accordingly done. No coal was found within the time stated in the contract. Wooldridge died in 1814. About the middle of July, 1820, Heth found on the land a valuable body of coal. In the early part of the vear 1821, Heth died. In April, 1822, this Bill was filed by the Executor of Wooldridge, against the Executor of Heth. It states the written contract, and makes it a part of the Bill. That Heth was a purchaser with full notice, having drawn the agreement: that under the agreement, some slight attempts were made to find coal, but that Heth being very anxious to employ his hands in working other pits, at his instance it was agreed between him and Wooldridge, that the search should be postponed till a more convenient time; and the said Heth agreed, that if at such future time, at which the search should be prosecuted, or at any time, a good and sutncient body of coal to work should be found on said land, the said augmented price of $2,000 should be paid. The Bill then states the subsequent findings of coal, the death of Heth; that by his Will, he subjected his lands to be sold by, his Executor; that Randolph qualified, sold the land and became the purchaser; that by the second contract, the augmented price became a charge upon the land; and prays a Decree for the money', and a sale of the land in defect of payment.
The Executor of Heth answered, averring that both Blunt and Heth, being exceedingly anxious to find coal as soon as possible, commenced searching for it immediately after the 29th July, 1S07, (before Blunt was required by the contract to do so,) in conformity with the directions of Wooldridge, which search was pushed on, by sinking a shaft, with the utmost vigour, till Christmas, 1807: that in the Spring of 1808, the sinking* of the shaft *was resumed by Heth, and pushed on with like energy, till December, 1808, when it was suspended -in despair of finding coal there: that several years after, an European Collier of reputation, explored the direction of 'he coal in the adjoining land,, which had been worked for years, and revived the hope that coal might probably be found in the said shaft; that some time after this, the sinking of' the shaft was again resumed, and was carried on from time to time, until it was sunk many feet deeper in July', 1820. He positively denies the change of the first agreement by a second, stating many reasons for disbelieving it, and relying on he Statute of Frauds and Perjuries, as a de-fence. Evidence on both sides was taken, the cause came to a hearing, and the Chancellor decreed, that the additional price be paid, and that unless such payment be made within six months, the land be sold to raise the money. From this Decree the appeal is taken.
The first question respects the Statute of Frauds. “No action shall be brought, whereby to charge any person upon any contract for the sale of lands, tenements and hereditaments, &c., unless the promise or agreement, &c., or some memorandum or note thereof, shall be in writing, signed by the party to be charged therewith, or some other person by him thereunto lawfully authorised.” Having in the case of Anthony v. Leftwich, 3 Rand. 238, given my opinion on the general policy of this Statute, and the mischiefs which (in my mind) have followed its relaxation by Courts of Equity, I shall make no further remarks on that subject. With respect to parol agreements for the sale of lands, I believe the Courts have never gone further than to say, that wherever such agreement has been so far executed, that a refusal of full execution would operate a fraud upon a party, and place him in a situation which did not lie in compensation ; then a specific execution would be given, provided the contract were clearly established. Before we come to the application of this Statute, we must determine the nature of the contract relied on by tne *Plaintiff. That it is a contract for the sale of land, all must agree. Is it a written or parol contract? Or, is it a written contract, varied by a subsequent parol contract, which the Plaintiff seeks to set up and enforce? The Plaintiff states the written contract for the sale of the land, and makes it a part of his Bill. This is a perfect contract, and as to the claim of the additional $2,000, makes that depend on the finding coal before the 1st of July, 1809; *843 but, it is most clear, that this additional sum is not claimed by the Bill under this contract: and equally clear, that if it had been, it could nqt be recovered; for, it is admitted on all hands, that no coal was discovered for eleven years after the time which this contract limits for its discovery. The Bill states, that there was a subsequent agreement as to the time of search for the coal, and the payment of the additional $2,000, but this is neither stated nor proved as an independent agreement; indeed, it would be unintelligible unless connected with the written contract, nor would it be at ail less exposed to the operation of the Statute, nor the mischiefs which it was intended to remedy, by taking it as standing by itself. The truth (as it seems to me,) is, that this is a Bill relying on the written contract, to show that by the terms of sale, Blunt was bound to seek for coal twelve months before the 1st July, 1809, and if found in that time, was to pay $2,000 more, and relying on the verbal agreement to show that the parties subsequently changed these terms of the written agreement, Wooldridge agreeing to let Heth off from searching within the time limited, and Heth agreeing that ne would resume the search when convenient, and would pay the additional $2,000, if at any time coal should be found. Can a party in Equity enforce a written contract thus varied by parol? The mischief intended to be remedied by this part of the Statute, were the frequent perjuries committed in swearing to parol agreements set up by persons with whom none such had been made. To countervail such proof, (it admitted at all,) *would generally be impossible, because the parties would take care so to fix the time and jflace of such agreements, as to have no other witnesses present; and then the negative was out of the reach of proof. The Legislature, therefore, thought that the only cure for the evil was to take away entirely, to cut up by the roots, all parol agreements for the sale of lands. Courts of Equity have narrowed this somewhat, by their doctrine of part-performance, but, still, it is settled Law, that a naked parol agreement for the sale of land is void, yea, even if the Defendant, by his Answer, acknowledge the agreement precisely as stated, provided he, at the same time, pleads the Statute. See 2 Bro. Ch. Ca. 564 ; 1 Bro. Ch. Ca. 416; 4 Ves. 23; 6 Ves. 12; 2 Hen. Bl. 63. Is the attempt to vary this written contract by parol, within the mischiefs of the Statute? Let us look at the circumstances. The written contract was made in 1807; the parties, with great particularity, set down all the terms and conditions of their agreement. Fifteen years after this, and after Wooldridge and Heth were both dead, this Bill is filed, claiming* the augmented price of the land, under this parol variation of the contract. How is the new agreement proved? By the testimony of a single witness, (William Wool-dridge,) who had been appointed Executor of Wooldridge, the vendor, had qualified, and had afterwards been disqualified, without which he could not have been a witness in the cause. Did he hear the contract made? No! but in the latter part of the year 1808, he met Heth on the road, and Heth, in a casual conversation, told him of the new arrangement between himself and Wooldridge; no other person present. Nor is there another witness who speaks of having heard from any quarter, the slightest intimation of this change of the written contract. The witness gives his evidence in 1824, and speaks from memory solely, of a conversation accidently held upwards of fifteen years before, a conversation in which he had no interest, to impress it on his memory; and the import of which may have been materially ^changed, by a slight misunderstanding in the delivery, or misgiving of memory, in the recollection of it. Nor is there, in the nature of things, any possible check (except the Statute) upon any misstatement of his, whether accidental or wilful. When I speak thus, no one can so far misunderstand me as to suppose that I mean a personal reflection. The witness stands upon the Record perfectly fair in his reputation, and so I take him. But we can make no distinction ; for the Law has made none; and I am supported by the Law and the Authorities, when I say that this case presents, in a strong point of view, the very mischiefs which the Statute meant to prevent. These remarks equally apply, whether we consider this as an independent, unconnected, parol contract about the sale of land; or, an attempt to enforce a parol variation of a written contract for the sale of land. The latter, as I have said, strikes me as the true point of view. Many cases might be cited, to show that a written agreement cannot be varied by parol, but the Law is too well settled to require it. I will only cite one, Jordan v. Sawkins, 3 Bro. Ch. Cas. 388; 1 Ves. jr. 402. A lease was agreed by writing to be granted of a house for twenty-one years,, to commence from 21st April, 1791, and it was afterwards agreed by parol, that the lease should commence 21st June, instead of 21st April. To a Bill filed by the tenant for a specific performance of the written agreement, varied by the parol agreement, the Statute of Frauds was pleaded, and Lord Thurlow held, that the different period of commencing the lease made a material variation, as it gave the estate from the owner for so many months longer, and therefore he allowed the plea. The variation attempted in the case before us, is of much more importance, it goes to double the price of the land. Is there any such part-performance of this alleged parol contract as will take it out of the Statute? The Boobs Bay, that an agreement will not be considered as partly executed, unless the acts done are such as could be done with no other view or design *than to perform the agreement, and if it do not appear, but that the acts done might be done with other views, the agreement will not be taken out of the Statute. The Bill in the case before us, states no such act, nor does the evidence disclose any such. If it be said that the suspension of the search for coal was such act, the answers are, 1st. That this is no-act, but merely a forbearance to act; which *844 Is laid down to be wholly insufficient: 2dly. The party might suspend the search, because he chose to break his covenant, and answer for such breach at Law; or, 3dly. He migth suspend the search, because he considered that he had complied with his contract by searching twelve months, which .there is a good deal of evidence to show he might well think he had done. ' There is, then, no act of part-performance. There were several other points made, of which I take no notice, because the ground on which I have placed the case is perfectly conclusive to my mind, that the Decree should be reversed, and the Bill dismissed.
The PRESIDENT and JUDGE COAL-TER, concurred.*